IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

JOHN "JAY" MYATT                                                                  PLAINTIFF

V.                      CASE NO. 3:17-CV-03102

SMITH & NEPHEW, INC.                                              DEFENDANT

## MEMORANDUM OPINION

### I. BACKGROUND

This case involves the failure of a hip-replacement prosthetic device that was manufactured by Defendant Smith & Nephew and implanted in Plaintiff John "Jay" Myatt. The device at issue is identified as a "size 15 Synergy Femoral Stem implant," but for ease of reference will be referred to throughout this opinion as the "Synergy Stem." In very simple terms, when a patient undergoes a hip replacement surgery using this device, the Synergy Stem—which is a metal shaft made of a titanium alloy—is driven into the patient's femur and then attached to a metal or ceramic femoral head. The femoral head is then inserted into the socket of the patient's pelvis.

According to the undisputed facts, Myatt underwent a hip replacement surgery after he was involved in a serious car accident in 2004. The doctor who performed the surgery implanted the Synergy Stem in Myatt's right femur and connected the device to a femoral head, which was inserted into the right socket of Myatt's pelvis. Sometime within the next five years after the surgery, Myatt began experiencing pain and limited range of motion in his right hip. He was evaluated by Dr. Gordon Newbern, who

1

diagnosed Myatt in 2009 with heterotopic bone growth[1] around the right pelvis and femur. Dr. Newbern determined that the excess bone that had developed around the site of the hip replacement was responsible for Myatt's symptoms of pain and limited range of motion.

On October 8, 2009, Dr. Newbern performed surgery on Myatt, cutting the excess bone from around his hip, but leaving the Synergy Stem in place. Dr. Newbern's operative report described the procedure as follows:

> There was a large amount of heterotropic [sic] bone emanating from the posterior ilium, essentially encasing the acetabular component. There was bone _____ from the posterior greater trochanter, almost coming in contact with the heterotropic [sic] bone from ilium. The external rotators were bound up in this tissue, but most of the external rotators had been replaced by bone and no usable external rotator tissue remained. Once the soft tissue had been cleared and, at all times, taking care to avoid injury to the sciatic nerve, the heterotopic bone was removed with osteotomes, chiseling it away back to close to normal contours. The large amount of extra bone that had replaced the area of the femoral neck was also removed with reciprocating saw, and, in this fashion, systematically, all the extra bone around the hip was removed. There was significant amount of bone superiorly, which had been blocking abduction, and this was removed also. The hip was then dislocated. The Oxinium head was removed, and the bone and scar tissue were removed circumferentially around the hip. There was excess bone inferiorly, superiorly, and anteriorly, and this was all carefully removed.

(Doc. 24-7, pp. 2-3).

Myatt testified that after the 2009 surgery, he limped less. (Doc. 24-5, p. 13). Dr. Newbern reported that Myatt "seemed to be feeling much better for having had the heterotopic bone removed and had made a good recovery[,] but he still had stiffness with

---

[1] Heterotopic bone growth is defined as "the formation of bone outside the normal skeleton," which "can occur in soft tissue and is usually found within muscular, adipose, or nonmuscle fibrous or connective tissue." https://www.mayoclinic.org/medical-professionals/endocrinology/news/diagnostic-approach-to-disorders-of-extraskeletal-bone-formation/mac-20429760 (last visited January 16, 2019).

only 7 degrees of external rotation and 5 degrees of internal rotation but without discomfort." (Doc. 31-1, p. 1).

On June 30, 2016, nearly seven years after the 2009 surgery, Myatt's right hip gave way underneath him as he was walking across a parking lot. He was taken to the hospital, where x-rays showed the Synergy Stem had broken into two pieces at the area of the femoral neck. Myatt underwent another surgery on July 1, 2016, and Dr. Newbern removed the broken Synergy Stem and replaced it with a new hip prosthesis that was not manufactured by Smith & Nephew. Myatt then developed an infection at the site of the surgery, and on April 26, 2017, Dr. Newbern performed an operation to clean, remove, and replace parts of the new hip device. Myatt filed this lawsuit in the Circuit Court of Searcy County, Arkansas, on October 10, 2017, and it was removed to this Court by Smith & Nephew on November 9, 2017. *See* Doc. 1.

In the Complaint (Doc. 3), Myatt asserts five causes of action against Smith & Nephew. Count I is a claim for negligence; Count II is a claim for strict products liability; Count III is a claim for a breach of the implied warranty of merchantability; Count IV is a claim for a breach of the implied warranty of fitness for a particular purpose; and Count V is a claim for a breach of express warranties. Smith & Nephew has moved for summary judgment on all Counts. Defendant has also filed three motions in limine to exclude some or all of the expert testimony of three of Myatt's witnesses: metallurgist William R. Coleman, damages expert Dr. Ralph J. Scott, and Myatt's treating physician, Dr. Newbern. Below, the Court will take up the motions in limine first, followed by the motion for summary judgment.

## II. LEGAL STANDARDS

### A. Exclusion of Expert Testimony

The decision whether to exclude expert testimony is committed to a district court's discretion, subject to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (8th Cir. 2014). Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Eighth Circuit has "boiled down" these requirements into a three-part test:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)).

The proponent of expert testimony bears the burden of showing by a preponderance of the evidence that these requirements are satisfied, but "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006). Nevertheless, "a court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.'" *Id.* at 758 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

## B. Summary Judgment

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

### A. Motion to Exclude Expert Testimony of William R. Coleman (Doc. 27)

Smith & Nephew argues there are three reasons why Mr. Coleman should not be permitted to testify. First, Defendant contends that since Mr. Coleman's experience and

5

expertise are limited to the fields of metallurgical, mechanical, and general engineering—and since he admittedly has no expertise in the areas of design, manufacture, or biomechanics of a medical device—he is unqualified to opine about possible causes of Myatt's Synergy Stem failure. Generally speaking, it is Mr. Coleman's opinion that a defect in the metal composing the Synergy Stem rendered the device more susceptible to cracking, breaking, and ultimate failure. But Smith & Nephew believes that if Mr. Coleman is permitted to testify solely as to the metallurgical composition of the Synergy Stem, "without any consideration of the biomechanical or orthopedic issues that were also involved," this testimony would offer only an incomplete picture of the facts and would tend to confuse and mislead the jury. (Doc. 28, p. 9).

The Court has reviewed Mr. Coleman's expert report and deposition testimony and finds that he agreed in his deposition that he was not qualified to testify about all possible causes of the failure of the Synergy Stem except those related to metallurgical and engineering principles. His testimony goes solely to his observation of certain metallurgical flaws in the device itself. As Smith & Nephew does not seriously dispute Mr. Coleman's qualifications to testify as to metallurgical principles or mechanical or general engineering principles, it is appropriate for Mr. Coleman to offer opinions as to those areas, and not to others. For example, if Mr. Coleman attempts at trial to offer opinions relying on the fields of biomechanics, prosthetic design, or orthopedic surgery, he will not be permitted to do so, as he is not qualified to offer expert opinions in those areas.

It appears Smith & Nephew's argument about Mr. Coleman's qualifications to testify as an expert may have more to do with a dispute with the factual basis for his

conclusion that the device was not manufactured according to appropriate specifications. Mr. Coleman's scientific methodology in conducting destructive testing on the device does not appear to be disputed in the motion, though counsel for Smith & Nephew is, of course, free to do so in cross-examination at trial. Overall, though, the Court is persuaded that Mr. Coleman's expected testimony is based on scientific, technical, or other specialized knowledge that he has developed through testing methods that are capable of reproduction and critique by other experts. Accordingly, this testimony will be useful to the jury.

Second, Smith & Nephew argues that Mr. Coleman's testimony is too inconsistent to be reliable and should not be presented to the jury for that reason. After reviewing Mr. Coleman's deposition and expert report (Doc. 36-1) the Court disagrees and finds that his research, methods, and conclusions appear to be thoroughly documented and organized. The expert report alone is fourteen pages long, and it is supplemented by more than 100 photographs, x-rays, scans, and charts. Although Smith & Nephew has raised various points of disagreement with Mr. Coleman's findings, the disagreement may be explored on cross-examination. In particular, if Smith & Nephew's counsel wishes to point out to the jury any areas of inconsistency in Mr. Coleman's report and his deposition testimony, counsel is free to do so.

The final argument Smith & Nephew makes with respect to Mr. Coleman is that he holds himself out to be a licensed, professional engineer—and has signed his expert report as such—but does not possess an active professional engineering license in Oklahoma (where he was once licensed) or in any state. Mr. Coleman admitted in his deposition that he decided not to renew his Oklahoma license several years ago and is

7

now in "inactive" status. Myatt contends that Mr. Coleman's lack of an active professional engineering license should not render him incompetent to give testimony as an expert witness in this case. Mr. Coleman has an advanced degree in metallurgical engineering, has taught courses as an adjunct professor in the College of Engineering at the University of Oklahoma, has testified as an expert witness on metallurgical issues many times and has not been disqualified, and has served on the ASTM (American Society for Testing and Materials) committee for medical devices for seven years.

The Court agrees with Myatt that Mr. Coleman's significant experience and training in the relevant fields of metallurgy and metallurgical engineering qualify him to serve as an expert in those fields. His lack of professional licensure (and the ways in which he may have misled others, either intentionally or unintentionally, about the status of that licensure) goes only to the weight and credibility of his testimony. It is also potential fodder for cross-examination. For all these reasons, Smith & Nephew's Motion to Exclude Expert Testimony of William R. Coleman (Doc. 27) is **DENIED**.

### B. Motion to Exclude Expert Testimony of Dr. Ralph J. Scott (Doc. 29)

Smith & Nephew also seeks to exclude the testimony of Dr. Ralph J. Scott, Myatt's damages expert, while at the same time conceding that Dr. Scott possesses the requisite knowledge, skill, training, and education to render him an expert in the field. Smith & Nephew believes Dr. Scott's testimony should be excluded because it is unreliable. Specifically, Defendant points out that Dr. Scott has based his opinion about Myatt's future earning capacity on a two-sentence letter from Myatt's former employer, and no other evidence. Smith & Nephew argues that "Dr. Scott failed to perform any additional investigation or analysis, including getting further details about how [Myatt's former

8

employer] came to the numbers, or Plaintiff's specific work history." (Doc. 30, p. 5). It appears Smith & Nephew also disagrees with how Dr. Scott calculated Myatt's lost household services, since Dr. Scott relied only on conversations with Myatt and "did not perform any additional investigation or study . . . ." *Id.* at 6.

The Court has reviewed Dr. Scott's background, qualifications, and deposition testimony and finds that he possesses the requisite knowledge and experience to assist the trier of fact regarding the issue of damages. His testimony is reliable in an evidentiary sense because his methodology is clear, and his results are based on data and other information he collected, as well as interviews with Myatt. Smith & Nephews' disagreement with Dr. Scott's conclusions goes to the weight of his expected testimony, not to its admissibility, and cross-examination will allow Defendant to convey its concerns to the jury. Accordingly, Smith & Nephew's Motion to Exclude Expert Testimony of Ralph J. Scott (Doc. 29) is **DENIED**.

### C. Motion to Exclude Expert Testimony of Dr. Gordon Newbern (Doc. 31)

Smith & Nephew's final motion in limine concerns the exclusion of only a part of Dr. Gordon Newbern's expected testimony: his ultimate opinion regarding the cause of the failure of Myatt's Synergy Stem device. The Motion explains that Dr. Newbern opined in an earlier deposition, and in a letter he wrote prior to that deposition, that "some imperfection in the purity to the alloy or impurity of the metal or some unexpected defect in the manufacturing process of this high-tech titanium metal alloy femoral stem" caused the Synergy Stem "to break very prematurely" in June of 2016. (Doc. 31-1, p. 3).

Dr. Newbern is Myatt's treating physician. In most respects, he is the sort of fact witness whose testimony does not implicate Federal Rule of Evidence 702 or Federal

9

Rule of Civil Procedure 26(a)(2)(B). By the same token, Dr. Newbern is also an experienced orthopedic surgeon whose medical knowledge, training, and expertise form an inseparable backdrop to his factual encounters with Myatt. Within the confines of explaining his factual interactions and treatment of Myatt, it is certainly acceptable under Rule 701 for Dr. Newbern to offer opinions that are rationally based on his first-hand knowledge and perceptions. But Rule 701(c) circumscribes the permissible boundaries of Dr. Newbern's lay opinions. "A treating physician's expert opinion on causation is subject to the same standards of scientific reliability that govern the expert opinions of physicians hired solely for purposes of litigation." *Turner v. Iowa Fire Equip. Co.,* 229 F.3d 1202, 1207 (8th Cir. 2000).

While it is true that he has expertise in the use and implantation of titanium alloy hip stems, Dr. Newbern readily admits that he is not a product designer, a chemist, or a metallurgist. The Court is therefore *not* persuaded that Dr. Newbern is even qualified to offer Rule 702 opinions relating to the metallurgic properties, manufacturing process, design, and/or chemical composition of the Synergy Stem at issue in this case. Moreover, Dr. Newbern's ultimate causation opinion is not based on scientific data, testing, and/or the application of scientifically reliable principles and methods. Instead, Dr. Newbern merely surmises that a defect in the metal must have caused the Synergy Stem to break, since he cannot fathom another reason why the break might have happened. Dr. Newbern's causation opinion is scientifically unreliable–and therefore inadmissible– because it amounts to nothing more than *ipse dixit.*

In summary, Dr. Newbern will be permitted to opine about subjects within the scope of his medical knowledge and experience, as well as the facts surrounding his diagnosis and treatment of Myatt. But he will not be allowed to offer causation opinions regarding the failure of the Synergy Stem in Myatt's case. More specifically, with reference to Dr. Newbern's January 23, 2018 letter, he will be permitted to offer an impairment-rating opinion, as he is qualified to do so under Rule 702, subject to laying a proper foundation at trial. In addition, he will be permitted—pursuant to Rule 702 and subject to a proper foundation—to offer the following opinion about the normally anticipated longevity of a hip stem: "A modern titanium stem is expected to last well past 20 years of use, expecting on average around 6,000,000 cyclic loads per year during its service life. Usually problems with wearing out of the bearing surfaces or other mechanical or infection problems would lead to the prosthesis being revised . . . ." (Doc. 31-1, p. 3). Dr. Newbern will *not*, however, be permitted to offer the following opinion: "In Mr. Myatt's case the fatigue strength of the metal was surpassed causing it to break . . . I believe this resulted from some imperfection in the purity to the alloy or impurity of the metal or some unexpected defect in the manufacturing process of this high-tech titanium metal alloy femoral stem." *Id.*

Accordingly, the Motion to Exclude Expert Testimony of Dr. Gordon Newbern (Doc. 31) is **GRANTED** to the extent that Dr. Newbern will be prohibited from offering opinion testimony at trial as to the cause or causes of the failure of Myatt's Synergy Stem implant.

### D. Motion for Summary Judgment (Doc. 24)

The Court will begin its discussion regarding Defendant's request for summary judgment with an analysis of Count II of the Complaint, which is a cause of action for

11

products liability. To prevail on summary judgment on this claim, Smith & Nephew must establish there are no genuine, material disputes of fact as to whether the Synergy Stem was supplied to Myatt in a defective condition that rendered it unreasonably dangerous, and whether that defective condition was a proximate cause of his injuries. Ark. Code Ann. § 16-116-101. After consideration of the evidence presented on summary judgment, the Court finds there are, indeed, genuine, material disputes of fact as to whether the Synergy Stem had a manufacturing and/or compositional defect at the time it was implanted in Myatt's hip and whether that defect proximately caused his injuries. Defendant primarily contends that numerous scratches on the device indicate that a reciprocating saw or other surgical instrument wielded by Dr. Newbern during Myatt's 2009 surgery weakened the metal structure of the device and caused it to fail. Plaintiff contends the device failed because its metallic structure was defective, in that it was not heat-treated correctly to put the metal in the optimum condition to survive its intended use. Each side's contention is supported by expert testimony. Defendant disputes this theory of causation. Given this dispute of material fact, summary judgment is denied as to Count II.

Summary judgment as to Count I's claim for negligence is similarly denied. The Arkansas Supreme Court has established that a negligence claim requires proof of "a failure to exercise proper care in the performance of a legal duty which the defendant owed the plaintiff under the circumstances surrounding them." *Marlar v. Daniel*, 247 S.W. 3d 473, 476 (Ark. 2007). Here, Myatt alleges that Smith & Nephew breached the duty of care owed by a manufacturer of a medical device to an end user, in that the Defendant failed to manufacture the Synergy Stem in a manner that would not cause injury and

would not contain material defects. "Negligence and strict liability are not mutually exclusive claims. More than one theory of liability is permissible in a products liability claim." *Nationwide Rentals Co., Inc. v. Carter*, 298 Ark. 97, 100-01 (1989). The Court finds that a genuine, material dispute of fact exists as to whether Smith & Nephew was negligent in its manufacturing of the Synergy Stem.

As to Counts III and IV, which are claims for breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular purpose, respectively, the Court finds that genuine, material disputes of fact remain that preclude summary judgment. "If the particular purpose for which goods are to be used coincides with their general functional use, the implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability." *Great Dane Trailer Sales, Inc. v. Malvern Pulpwood, Inc.*, 301 Ark. 436, 443 (1990). A valid claim for breach of implied warranty of merchantability requires that the product in question be unsuited for its ordinary purpose. Ark. Code Ann. § 4-2-314. A valid claim for breach of implied warranty of fitness for a particular purpose requires that the product be unfit for the purpose for which it was required. Ark. Code Ann. § 4-2-315.

Smith & Nephew maintains that the breach of implied warranty claims must fail because the Synergy Stem was both suited for and fit for use as a hip implant and served its intended purpose of restoring the use of Myatt's hip for over twelve years. The Court finds there are genuine, material disputes of fact as to whether the Synergy Stem was suited or fit for use as a hip implant device and whether its failure after twelve years was within known and acceptable industry and medical parameters for this type of product. Accordingly, summary judgment is denied as to Counts III and IV.

Finally, as to Count V's claim for a breach of express warranties, there is no evidence in the record that Myatt received any express warranties concerning the Synergy Stem. There is also no evidence in the record that Myatt actually relied on a term of an express warranty. Both elements must be established for the claim to be viable. *See* Ark. Code Ann. § 4-2-313. For these reasons, summary judgment is granted as to Count V.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Smith & Nephew, Inc.'s Motion for Summary Judgment (Doc. 24) is **GRANTED IN PART** as to Count V **AND DENIED IN PART** as to Counts I, II, III, and IV of the Complaint.

**IT IS FURTHER ORDERED** that Smith & Nephew's Motion to Exclude Expert Testimony of William R. Coleman (Doc. 27) and Motion to Exclude Expert Testimony of Dr. Ralph J. Scott (Doc. 29) are both **DENIED**.

**IT IS FURTHER ORDERED** that Smith & Nephew's Motion to Exclude Expert Testimony of Dr. Gordon Newbern (Doc. 31) is **GRANTED** to the extent that Dr. Newbern will be prohibited from offering testimony at trial as to the cause or causes of the failure of Myatt's Synergy Stem implant.

**IT IS FURTHER ORDERED** that the parties are to attend a second settlement conference presided over by Magistrate Judge Erin L. Wiedemann. The date of the settlement conference will be set by separate Order.

**IT IS SO ORDERED** on this 6th day of February, 2019.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE